ANNIE L. HURDLE v. THE ALBEMARLE HOSPITAL, INC.

No. 691SC432

(Filed 17 December 1969)

**Hospitals § 3— liability for injury to patient — negligence of employee**

In an action on behalf of an eighty-eight year old arthritic patient who allegedly sustained a broken leg when an orderly employed by defendant hospital lifted the patient from a wheelchair and put her on the bed, the evidence is insufficient to support a finding that the patient's injury was proximately caused by any negligence of the orderly, and submission of the case to the jury was erroneous.

APPEAL by defendant from *Parker, J.,* 5 May 1969 Term of PASQUOTANK Superior Court.

This is a civil action tried before a jury in which the plaintiff seeks damages for injuries allegedly caused by an employee of the Albemarle Hospital.

Plaintiff is an eighty-eight year old incompetent person for whom suit was brought by Agnes Hurdle White who was duly appointed by the Clerk of the Superior Court of Pasquotank County as next friend, both plaintiff and next friend being residents of Camden County, North Carolina.

Plaintiff alleges that on 5 August 1968, while a patient at the Albemarle Hospital, she suffered fractures of both bones of her leg due to the negligent manner in which an orderly, Robert Johnson, lifted her and dropped her from her wheelchair into her bed causing her to cry out. This, together with allegations that the employee, an orderly named Robert Johnson, "did handle the plaintiff, a female patient, without the presence and help of a nurse, as required by the

hospital orders" and that said Johnson "did move the plaintiff from her wheelchair without the assistance of at least one other person, contrary to the hospital orders" constituted the allegations of negligence on which the plaintiff's claim was founded. Plaintiff did not allege negligence in the selection and retention of the employee, nor managerial or administrative negligence on the part of the hospital.

The jury answered the issues in favor of the plaintiff and from judgment thereon the defendant appeals.

*Thomas Chears, Jr., and Steingold and Steingold of Norfolk, Virginia, by J. Cameron Mann for plaintiff appellees.*

*Hall and Hall by John H. Hall for defendant appellant.*

VAUGHN, J.

We deem it necessary to comment upon but one of the questions presented upon appeal by the defendant. The defendant frames the question, to which we respond in the affirmative, as follows:

"1. Did the Court commit reversible error in failing to grant defendant's motion for judgment of nonsuit, entered when plaintiff rested, and renewed at the conclusion of the evidence?"

The complaint alleged that the employee of the defendant, upon moving the plaintiff from her wheelchair to her bed, "dropped the plaintiff on the bed in such a manner as to cause her legs to become entangled and severely bent in a backwards position which caused the plaintiff to cry out," and that approximately two hours later the plaintiff was found by her daughter to have suffered broken bones in her leg.

The evidence failed to disclose any "dropping" of the plaintiff. The complete testimony of the only eyewitness to the alleged incident, Mrs. Dorothy Whitehurst, a witness for the plaintiff, is as follows:

"On August 5, 1968, I was in the Albemarle Hospital as a patient, and had been there since June 16. I was a patient in the same room with Mrs. Annie Hurdle. I was next to the window on one side of the room, and she was over there by the closet on the other side of the room. I saw an orderly in the afternoon of August 5, 1968, take Mrs. Hurdle up from the bed and put her in the wheelchair. They then pushed her out in the hall, and the nurse fed her supper about 5:00. The same orderly brought her back in the room, he took her up, and put her back to bed, his name was Bob Johnson. He taken her underneath

her arms, and lifted her over his head when he taken her out of the wheelchair, and put her back on the bed. (The witness illustrated by showing that the orderly took Mrs. Hurdle under her armpits, and lifted her up in that manner.)

I know Mrs. White, and she is the daughter of Mrs. Hurdle. She came in the room later, and Mrs. White, like she did every time she came, she would generally straighten Mrs. Hurdle's legs out, and sit her up in the bed for awhile until the nurses came and were going to fix her for bed that night. When Mrs. White taken hold of Mrs. Hurdle's legs to start to straighten them she hollered and started crying. She was not able to move herself in bed."

Plaintiff's physician, Dr. Wassink, testified in substance as follows. He admitted plaintiff to the hospital some three weeks earlier because there was no other place for her to stay. She had been suffering from arthritis for years. She had previously sustained a fracture of her hip and for two or three years prior to that time she was bedridden and unable to walk. Neither of her legs would ever be weight bearing. She has a condition known as osteoporosis which he described as a condition by which the calcium disappears from the bone and therefore leaves the bone in a weakened condition and "causes what you might say soft bones." The calcium in plaintiff's right leg had disappeared to a considerable extent. He could not say whether plaintiff had enough strength to have caused her leg to be fractured through her own movements. It would be possible for the fracture to have been caused by "natural causes." It would be unusual if it happened spontaneously. For at least three weeks prior to August 5th he had had her taken from her bed and placed in a wheelchair once or twice a day. A sheet was tied in front of her so she wouldn't fall out of the chair. The plaintiff's general mental condition was such that she was clear at times and at times would be slightly confused. She gave no history as to how the fracture occurred. Results of the x-ray report were introduced by the plaintiff which read: "X-ray on 8-6-68 showed a fractured tibia and fibula with severe osteoporosis. /s/ Dr. Wassink."

The plaintiff's daughter, Mrs. White, testified that she visited her mother on 5 August 1968 at about 6:30 or 7:00 and that

"[w]hen I walked in I saw a different expression on my mother's face. She was lying on her left side and I said 'Mama, that is all right. I am going to sit you up and you'll be comfortable.' So, as usual, I pulled the cover down to straighten her legs out, I mean by straightening her legs out to pull them down a little,

they were kind of bent over, and I wanted to get her over on her back. I started cranking the bed, and then I went back to straighten her up a little more before I sat her all the way up. That is my usual procedure with her. On this particular night as soon as I turned the covers down and took hold of her legs, she was lying on her left side, and she hollered, 'Oh, my leg,' and she said 'You are pulling my leg off.' I wasn't even touching it then."

She noticed a knot about the size of her fist right above the ankle on the inside of her right leg. She had not observed the knot on the previous night when she arrived to make her mother comfortable and have her sit up before time for her to retire for the night. When she moved her on the previous night, plaintiff did not make any complaint. Plaintiff had not tried to stand on either leg for the last six or seven years.

The administrator of the hospital testified as a witness for the plaintiff, in pertinent part as follows. The hospital had no standard or regulation for transferring a patient in bed to a wheelchair but a nurse was required to be present when an orderly handled a female patient. Plaintiff offered into evidence a paperwriting which was identified by the administrator as an "incident report." The report stated that a nurse was present when the patient was moved.

The defendant offered evidence from the orderly and nurse who were present at the time the plaintiff was taken from and returned to her bed along with that of the nurse in charge of the floor. Although this evidence tended to show that the plaintiff was at all times handled in a careful and prudent manner, it is not to be considered unless favorable to the plaintiff, and except when not in conflict with plaintiff's evidence, it may be used to explain or make clear that which has been offered by the plaintiff.

Suffice to say that defendant's evidence casts no additional light on how, when or why plaintiff's leg was broken. Evidence from the nurse who was present and from the orderly, not in conflict with plaintiff's evidence, (as contrasted with her allegations) tended to show the nurse held the wheelchair while the orderly lifted the plaintiff and placed her in the bed *on her back;* that she was in no way dropped and gave no indication of pain; that plaintiff's knees were usually bent and that on this occasion pillows were placed under them for support.

The evidence has been set forth in considerable detail. We do not deem it necessary to enumerate all the random conclusions

which could arise therefrom except to say that viewing the evidence with liberality, we reach the conclusion that the case should not have been submitted to the jury. Negligence on the part of the defendant as the proximate cause of plaintiff's injury does not appear. The evidence does not bridge the hiatus between the act complained of and the injury.

Under the circumstances of this case, the fact that the injury occurred while the plaintiff was under the care of the defendant does not afford any evidence that it arose from the negligence of the defendant's employee. This is not a case where the very nature of the injury is inconsistent with any hypothesis other than that the employee was negligent, or that, indeed, the injury was proximately caused by such negligence if it could be assumed to have existed. On the contrary, the injury is such that it can be explained by the existence of the diseased bone and by other circumstances consistent with due care.

Defendant's motion for nonsuit at the close of the evidence should have been allowed. The judgment of the superior court is

Reversed.

BROCK and BRITT, JJ., concur.